UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

JOHNNY THORNBURN,

*Plaintiff,*

v.

DOOR PRO AMERICA, INC.,

*Defendant.*

2:16-CV-03839-DRH-AKT

---

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL COLECTIVE ACTION CERTIFICATION ON BEHALF OF DEFENDANT DOOR PRO AMERICA, INC.**

---

Michael K. Chong, Esq.
Law Offices of Michael K. Chong, LLC
Attorney for Defendant
2 Executive Drive, Ste. 720
Fort Lee, NJ 07024
(201) 947-5200
mkc@mkclawgroup.com

## TABLE OF CONTENTS

STATEMENT OF PROCEDURAL HISTORY                                3

STATEMENT OF FACTS                                            6

LEGAL ARGUMENT

    Point I
    Based On A Full Evidentiary Record After
    The Completion Of Discovery, Plaintiff Fails
    To Adquately Demonstrate That He And The
    Putative Collective Class Members Are
    Similarly Situated Where The Deer Park Branch
    Has A Substantially Different Compensation Plan
    And Rate Than The Other Seven Branches; Plaintiff
    Fails To Demonstrate The Existence Of A Common
    Policy Or Practice That Is Facially Invalid Under
    The FLSA Or The Existence Of An Implementation Of A
    Common Plan Or Practice That De Facto Violates The
    FLSA
                                                             14

    Point II

    A Three Year Notice Period Is Appropriate
    Where There Is No Possibility Of
    Certification Of A Rule 23 Class For
    Claims Under The NYLL                            29

## STATEMENT OF PROCEDURAL HISTORY

The Plaintiff's Complaint was filed on July 11, 2016 (DE 1) and an Amended Complaint was filed on October 10, 2016 (DE 22). Both pleadings seek relief for overtime compensation, alleged unlawful deductions from wages, and spread of hours compensation (DE 1, ¶ 1; DE 22, ¶ 2).  The Complaint and Amended Complaint plead venue as proper in the Eastern District of New York based on the alleged conduct occurring in the County of Nassau and the County of Suffolk (DE 1, ¶ 5; DE 22, ¶ 6). The named Defendant is Door Pro America, Inc., pled as being a domestic business corporation operating at 199 Brook Avenue, Deer Park, New York ("the Deer Park location") (DE 1, ¶ 9; DE 22, ¶ 19).  It is pled that Plaintiff worked at the Deer Park location (DE 1, ¶ 18; DE 22, ¶ 28).

Plaintiff alleges that he regularly worked from 6:30 a.m. to no earlier than 7:00 p.m., Monday through Friday, and that he was occasionally required to work on Saturdays (DE 1, ¶s 19 and 20; DE 22, ¶s 29 and 30).  Plaintiff contends he worked no less than 12 hours per day and no less than 60 hours per week (DE 1, ¶s 21 and 22; DE 22, ¶s 31 and 32). Plaintiff was compensated on a "piece work" basis, i.e., "per unit" of garage door or motor installed. (DE 1, ¶s 23 to 25; DE 22, ¶s 34 and 35). Plaintiff also alleges that there were "chargeback" deductions from his

wages in the years 2013, 2015 and 2016 (DE 1, ¶s 30 to 32; DE 22, ¶s 39 to 42), and that he was not compensated for eight days of work at the end of his employment with Defendant (DE 1, ¶38; DE 22, ¶ 48).

The amendment to the Complaint added "Collective Action Allegations", and seeks to proceed as a collective action pursuant to 29 U.S.C. 216 (b) on behalf of purportedly similarly situated employees of Defendant who were allegedly denied payment of overtime compensation for hours worked over 40 hours in a week in violation of the FLSA (DE 22, paragraphs 8 to 16). The Amended Complaint pleads one cause of action under FLSA (First Count), four counts under the NYLL (Second through Fifth Counts), and an "alternative" claim for relief on the theory of unjust enrichment and quantum meruit (Sixth Count). Of the four NYLL counts pled, two plead claims unique to the Plaintiff: that there were unlawful deductions from his wages[1] (Third Count) and that he was not paid for the last eight days he worked (Fourth Count).  The other two NYLL counts are for alleged failure to pay overtime (Second Count) and alleged failure to pay spread of hours compensation (Fifth Count).

---

[1]As addressed *infra,* the deductions were to repay the employer for damage to the company owned truck Plaintiff drove, caused by two accidents Plaintiff was in while driving the truck.

The Court entered a Civil Conference Minute Order on October 4, 2016, establishing a discovery cut-off date of May 25, 2017. (DE 18, paragraph 10). On May 25, 2017, Plaintiff filed a Letter Motion for a 60 day extension of time to complete discovery, i.e., July 25, 2017. The proffered reasons for seeking the extension were that the depositions of Plaintiff and Jason Anderson, Plaintiff's supervisor when he was employed by Defendant, necessitated additional written discovery requests, and that Plaintiff needed to depose Dean Dum, Defendant's Chief Financial Officer. (DE 48).

Mr. Dum was deposed on July 18, 2017, and Defendant responded to Plaintiff's Second Demand for Documents; Defendant is awaiting receipt of EZ Pass records from its EZ Pass vendor to complete its response to the Second Demand for Documents and will produce them to Plaintiff upon receipt.  Plaintiff served a Third Demand for Documents on August 5, 2017; although the Demand was served beyond the extended discovery cut-off date of July 25, 2017 requested by Plaintiff (but not then ruled upon by the Court), Defendant has nonetheless assembled the documents responsive to the Third Demand for Documents, and will produce the documents to Plaintiff within one week. With the exception of the EZ Pass records and the documents responsive to the Third Demand for Production of Documents, there are no outstanding discovery requests to the Defendant. (Chong Declaration).

The Court entered an Order on August 9, 2017 denying as moot the Motion for an Extension of Time to Complete Discovery.

Plaintiff now seeks conditional certification of a nationwide collective action on behalf of all persons employed by Defendant at locations in eight states as an installer for the past six year period.

## STATEMENT OF FACTS

Door Pro has branch locations in eight states, including the Deer Park, New York branch where the Plaintiff was employed. (Dum Decl., ¶ 2). Installers (also referred to as technicians) are compensated on a "per unit" basis for completed jobs; that is installers are paid a fixed amount of compensation for installation of a single garage door, a double garage door, any "extras" or accessories such as a garage door opener, or hardware for the garage door.  Dum Decl., ¶ 3). The "per unit" pay rate is not uniform for all eight Door Pro branches; the per unit pay rate varies according to geographic region. Dum Decl., ¶ 5). The per unit compensation rates paid to Deer Park installers are higher than the average rates paid to installers at the other Door Pro branches, and were established after the Deer Park branch manager "lobbied" for higher per unit pay rates for the Deer Park installers.  (Dum Decl., ¶ 6).

Jason Anderson is employed by Door Pro America, Inc. ("Door Pro") as the branch manager of the Deer Park location.  (Chong

6

Decl., Exhibit A, Anderson Dep., 9:2 to 15; 19:4 to 7). When
Anderson was hired as a branch manager, seven years ago, he had
one employee to supervise.  (Chong Decl., Exhibit A, Anderson
Dep., 9:6 to 22).  That employee was terminated in 2010
approximately a month after Anderson was hired as branch manager
in 2010. (Chong Decl., Exhibit A, Anderson Dep., 150:18 to 24;
151:22 to 152:6). He presently supervises four employees. (Chong
Decl., Exhibit A, Anderson Dep., 12:2 to 11).  One of the four
current employees is a warehouse worker and technician and is
paid an hourly rate; he is paid extra when he goes to a job site
to assist one of the installers. (Chong Decl., Exhibit A,
Anderson Dep., 20:22 to 21:20).  Another one of the four current
employees is a "helper" who is paid on an hourly basis. (Chong
Decl., Exhibit A, Anderson Dep., 24:1 to 8). Thus, only two
current employees are installers paid on a piece rate basis.
(Chong Decl., Exhibit A, Anderson Dep., 23:18 to 24).

There is a former installer employee who worked at the Deer
Park branch from 2012 to 2014. (Chong Decl., Exhibit A, Anderson
Dep., 151:13 to 19). In the past seven years, there have been
approximately 10 to 12 persons hired as trainees, who are paid a
salary during training, and didn't last more than a week or so.
(Chong Decl., Exhibit A, Anderson Dep., 151:2 to 12). There have
been installers who went through training and thought they could

do the job, but could not, and never lasted more than 3 to 4 months. (Chong Decl., Exhibit A, Anderson Dep., 150:7 to 14).

After Anderson was hired as the branch manager for Deer Park, he "fought" for Door Pro to raise the per unit rate paid to installers employed at Deer Park "because it is New York", and the rates being paid were not competitive.  The per unit compensation rates for the Deer Park installers were increased during the first year that he was the branch manager. (Chong Decl., Exhibit A, Anderson Dep., 62:8 to 63:12).

Door Pro compensates the Deer Park installers $60 for a single garage door, $120 for a double door, and $45 for installation of a garage door opener.  There is additional compensation to installers for accessories\extras – the customer is charged extra for installation of extras and accessories because installation of the accessories and extras requires more labor time for the installer. (Chong Decl., Exhibit A, Anderson Dep., 17:11 to 18:17).

The home office of Door Pro in Virginia prepares daily "run sheets" for each of the installers employed at the Deer Park location; the run sheets have the schedule and route for the scheduled installations.  The home office will ask Anderson for input as to how many units a particular technician can handle in a day.  Anderson provides input based on the distance to travel for the installation and the skill level of the technician.

8

Thus, for example, one experienced technician, Mario, could do six units in a day if the "route" is on Long Island, and "x" number of units if he has to travel upstate. (Chong Decl., Exhibit A, Anderson Dep., 48:14 to 49:3). Anderson determines how many jobs a technician can do in one day based on the ability and skill level of the technician, and can generally estimate how long an installation job will take. The installation of a single door should take between one and two hours; installer Mario can install a single door in 45 minutes. (Chong Decl., Exhibit A, Anderson Dep., 50:8 to 51:5)

In addition to compensation per unit installed, the Deer Park installers are compensated for their travel time to job sites. While each Door Pro branch, including Deer Park, covers an approximate 50-mile radius, the Deer Park location is by far the most traffic congested area of any of the Door Pro markets, and involves greater travel time for the installers to drive to job sites. (Dum Decl., ¶ 7). While previously Deer Park installers were paid $50 any time travel to a job site involved crossing the Throgs Neck Bridge, the Deer Park installers are now compensated for travel time according to the mileage travelled. It was the branch manager, Mr. Anderson, who "lobbied" for the Deer Park installers to be paid extra compensation for travel time based on mileage travelled. (Dum Decl., ¶ 9).

9

The extra compensation for travel time based on mileage for the Deer Park installers differs from the compensation plan for travel for Door Pro installers employed at other branches. (Dum Decl., ¶ 8). While installers at other Door Pro branches are occasionally paid extra for travel time if the travel is to a job site outside Door Pro's standard 50-mile radius, Deer Park installers are routinely paid $45 when the mileage travelled exceeds 60 miles, and Mr. Anderson has the discretion to approve the payment of extra travel time compensation when the mileage travelled is significantly greater than 60 miles. (Dum Decl., ¶s 9 and 10). Mr. Anderson's policy and practice is to approve payment of $45 to installers if they are required to drive over 60 miles up to 75 miles, and $90 if a technician drives over 90 miles. (Chong Decl., Exhibit A, Anderson Dep., 55:2 to 23).

The installers do not incur any personal expense for traveling to job sites; they drive a Door Pro owned truck, the company pays for tolls with an EZ Pass account, and the Deer Park location has a house account with a local gas station, Express Gas. (Chong Decl., Exhibit A, Anderson Dep., 19:8 to 21; 59:14 to 60:13).

The daily work schedule for installers is 7:00 a.m. to 5:00 p.m., which means the installers are supposed to be at the home\job site before then (i.e., at the last job site for the day before 5:00 p.m.). If an installer arrived at the last

home\job site for the day at 4:45 p.m., he could do the
installation if the homeowner agreed. (Chong Decl., Exhibit A,
Anderson Dep., 81:10 to 24).

Anderson receives the run sheet for the next day in the
afternoon the day before; he reviews the run sheets and if a
technician's route for the next day is too much to complete in
one day, he will advise the home office the route probably
cannot be finished in one day and asks them to try to reschedule
a job. (Chong Decl., Exhibit A, Anderson Dep., 49:15 to 24).

Anderson reviews with each installer the run sheet after
the day's jobs are completed, and makes handwritten notes on the
run sheets.  (Chong Decl., Exhibit A, Anderson Dep., 36:2 to
10).  He discusses the jobs with the installers and asks if
there were any "extras" and makes a note on the run sheet.  For
example, if the installation required framing, the installer
would be paid an extra $100. (Chong Decl., Exhibit A, Anderson
Dep., 37:17 to 38:5). Travel time and all of the piece work is
noted on the run sheets.  (Chong Decl., Exhibit A, Anderson
Dep., 57:3 to 15).

The installers' driving time is recorded on the run sheets,
together with all of the piecework performed. (Chong Decl.,
Exhibit A, Anderson Dep., 57:3 to 15). When the technicians call
in to Anderson during the day, he makes notes on the run sheet
for the "time in" and "time out" for their jobs. (Chong Decl.,

11

Exhibit A, Anderson Dep., 36:2 to 10). The installers are required to check in with Anderson when they have completed their jobs for the day, and they write their hours on their run sheets. (Chong Decl., Exhibit A, Anderson Dep., 26:1 to 14). Mr. Anderson's practice of annotating the run sheets to record the number of hours at each job, travel time, and "extras" or problems that required the installer to expend more labor hours to complete the job, is the uniform practice of the branch managers for all eight Door Pro branches. (Dum Decl., ¶12).

Anderson prepares a pay sheet which he then sends with the run sheet to the home office in Virginia where payroll is processed. (Chong Decl., Exhibit A, Anderson Dep., 36:16 to 37:14). The compensation scheme is such that the more jobs an installer completes, the more money he earns. (Chong Decl., Exhibit A, Anderson Dep., 86:23 to 87:3). Working on Saturdays is optional, and the opportunity to work on a Saturday is offered to the installers according to seniority, i.e., the opportunity would be offered first to the installer with the most seniority. (Chong Decl., Exhibit A, Anderson Dep., 102:6 to 19).

The Plaintiff was in an accident while operating the company owned truck, and verbally agreed to have $100 per week deducted from his pay to repay the cost to repair the damage to the truck. (Chong Decl., Exhibit A, Anderson Dep., 109:18 to

12

110:5). The Plaintiff was then in a second accident with the company truck and again agreed to repay the repair cost by having $100 deducted from his pay; however, the Plaintiff resigned his employment with Door Pro before the repair cost debt was paid in full. (Chong Decl., Exhibit A, Anderson Dep., 113:5 to 19; 115:11 to 19).

The number of jobs assigned to a technician to perform in a day is determined by the home office in Virginia, with input from the local branch manager- in this case, Jason Anderson. The determination of the number of jobs to be performed in a day varies according to the skill set, experience and productivity of the individual technician; the Virginia office relies upon Anderson for the determination of the skill set of an individual technician. (Chong Decl., Exhibit B, Deposition of Dean Dum, 22:18 to 24:23). The daily run sheets show what the technician's pay is for each job, and the total pay for the day. (Chong Decl., Exhibit B, Deposition of Dean Dum, 32:3 to 9). Payment to technicians for travel time is determined by the local manager.

To illustrate the annotation of the run sheets by Anderson after the jobs were completed, a representative sample of a "marked up" daily run sheet for the Plaintiff, marked as an Exhibit at Plaintiff's deposition, is attached as Exhibit C to the Chong Declaration. The run sheet has handwritten notations

13

by Mr. Anderson (Chong Decl., Exhibit D, Thornburn Deposition 238:9 to 18); the handwritten notes are made by Mr. Anderson when he sits down with a technician to go over the work completed, and to "piece out" the pay for each job, and the total daily pay. (Chong Decl., Exhibit D, Thornburn Deposition, 238:20 to 239:9; 240:17 to 24; 241:13 to 18).

## LEGAL ARGUMENT

### POINT I

**BASED ON A FULL EVIDENTIARY RECORD AFTER THE COMPLETION OF DISCOVERY, PLAINTIFF FAILS TO ADQUATELY DEMONSTRATE THAT HE AND THE PUTATIVE COLLECTIVE CLASS MEMBERS ARE SIMILARLY SITUATED WHERE THE DEER PARK BRANCH HAS A SUBSTANTIALLY DIFFERENT COMPENSATION PLAN AND RATE THAN THE OTHER SEVEN BRANCHES; PLAINTIFF FAILS TO DEMONSTRATE THE EXISTENCE OF A COMMON POLICY OR PRACTICE THAT IS FACIALLY INVALID UNDER THE FLSA OR THE EXISTENCE OF AN IMPLEMENTATION OF A COMMON PLAN OR PRACTICE THAT DE FACTO VIOLATES THE FLSA**

For the past year, the parties have been litigating a single claim by a former disgruntled employee, with the prospect of conditional certification of a collective action for Deer Park installers lurking in the background.  Plaintiff consistently pleaded this case in the Complaint and Amended Complaint as one involving one installer, and possibly a collective class of installers, all employed at the Deer Park branch of Door Pro. Now, without any prior hint that Plaintiff intended to seek conditional certification of a nationwide

14

class, and after the expiration of the discovery deadline (even
after the requested but never granted 60 day extension of
discovery), Plaintiff suddenly seeks to expand substantially the
scope of the case by seeking conditional certification as a
nationwide collective action.

The requested expansion of the parameters of the litigation
to one involving installers employed at Door Pro branches in
seven other states flies in the face of the Complaint and
Amended Complaint, which focused solely on the Deer Park
location.  Plaintiff pled the Defendant's location as Deer Park,
New York, and that Plaintiff worked at the Deer Park branch.
Venue was pled as proper in the Eastern District of New York
because the alleged conduct occurred in two counties within the
Eastern District. Nothing in the Complaint or Amended Complaint
speaks to the existence of branches in other states, much less
puts Defendant on notice that after the close of discovery,
Plaintiff would seek to expand the scope to include branches in
eight states, requiring an entirely new round of discovery that
would include depositions of opt-in plaintiffs spread across the
country in seven other states. The sole purpose of amending the
Complaint was to add the "Collective Action Allegations", yet
those allegations make no mention of installers employed outside
the Deer Park branch, and do not even hint at certification of a
nationwide collective. No facts concerning the other branches

are stated in the Complaint or Amended Complaint, despite the fact that without discovery, Plaintiff was clearly aware of the existence of other branches; in his Affidavit in support of this Motion, Plaintiff alleges that "knows", based on a conversation with Jason Anderson, that all technicians or installers employed at any of Door Pro's locations were compensated on a piece rate basis. (Thornburn Affidavit, ¶17). On this ground alone, conditional certification of a **nationwide** collective class should be denied.

Substantively, conditional certification of a **nationwide** collective class must be denied as Plaintiff fails to make the requisite showing that he and the putative collective class members are similarly situated, and were subject to a common plan or policy that violated the FLSA. It is not disputed that all Door Pro installers were compensated on a piece rate basis according to the number of "units" installed. Piece rate compensation is facially valid under the FLSA, and to pass muster to establish the required showing of "similarly situated", Plaintiff must establish that the de facto implementation of the piece rate compensation plan was in violation of the FLSA.

Moreover, where it is the purportedly uniform compensation plan that is alleged to render the Plaintiff and potential opt-ins similarly situated, it is material that the Deer Park

16

installers are **not** similarly situated to installers from branches in other states in terms of the compensation paid.  The Deer Park installers were paid a higher per unit rate than installers employed at other branches, and unlike the installers employed at other branches, received extra compensation for travel time based on the mileage travelled to job sites.

Further, where discovery is complete and there is a full evidentiary record for the Court to consider in making its determination, it is appropriate to apply the more stringent standard of analysis used in the "second stage" of the certification determination to the similarly situated issue. This issue is addressed in more depth *infra.*

A two-step analysis is employed to determine whether an action should be certified as an FLSA collective action. <u>Cano v. Four M Food Corp.,</u> 2009 WL 5710143 at * 3 (E.D.N.Y. 2009).  The first step is to determine whether the proposed class members are "similarly situated."  At the initial stage, the evidentiary standard is lenient, and the plaintiff is required to make a modest factual showing to demonstrate that the plaintiff and proposed class members are similarly situated. <u>Id</u>.

The second phase of the FLSA collective action inquiry, by contrast, typically occurs after the completion of discovery, and the Court makes a factual finding based on the developed record as to whether or not class members are actually

17

"similarly situated". Id. at * 4. At this juncture, the Court examines the evidentiary record to determine whether the "opt-in" plaintiffs are in fact similarly situated to the named plaintiff. Id. In the second stage inquiry, after discovery has been conducted, the Court examines with a greater degree of scrutiny whether the members of the plaintiff class- including those who have opted in- are similarly situated. Laroque v. Domino's Pizza, LLC, 557 F. Supp. 2d 346, 352 (E.D.N.Y. 2008).

In Tahir v. Avis Budget Group, Inc., 2011 WL 1327861, at * 6 (D.N.J. 2011), the Plaintiff moved for conditional certification after the close of discovery. In denying conditional certification, the Court observed:

> Unlike the typical motion for conditional certification, . . . [p]laintiff's motion presents the similarly situated question after the close of discovery. In that way, it is more akin to the second stage. . . . The [c]ourt . . . [concludes] that, in such a hybrid situation involving a conditional certification motion filed at a point in the litigation in which the factual record is completely developed, the stricter standard should be applied in analyzing whether the named plaintiff has demonstrated that he is similarly situated to the putative class members.

In this case, as in Tahir, the motion for conditional certification and the consideration of the similarly situated question comes after the close of discovery, and is more akin to a second stage inquiry. Where as here the factual record is completely developed, the stricter standard should be applied in

18

analyzing whether the named Plaintiff has demonstrated that he is similarly situated to the putative class members. Thus, it is appropriate for the Court to examine with a greater degree of scrutiny whether the members of the potential class are similarly situated. While Plaintiff cites herein accurately the language of the case law speaking to a "modest" factual showing for a first stage inquiry into the similarly situated issue, these citations should not be construed as a concession that the appropriate standard of analysis is whether Plaintiff has adequately made a "modest" showing that the potential class members are similarly situated; the appropriate standard of analysis is he greater scrutiny used in the second stage analysis.

The threshold issue in determining whether to authorize class notice in an FLSA action is whether plaintiffs have demonstrated that the potential collective class members are "similarly situated." Hoffman v. Sbarro, Inc., 982 F. Supp. 249, 261 (S.D.N.Y. 1997). While neither the FLSA or its implementing regulations define "similarly situated", in the typical case where conditional certification as a collective action is sought at an early stage of the litigation, when no or only minimal discovery has been conducted, the courts have held that a plaintiff can meet this burden by a "modest" showing sufficient to demonstrate that the plaintiff and the potential

plaintiffs were victims of a common policy or plan that violated the law. Id. (citing cases); *accord* Patton v. Thomson Corp., 364 F. Supp. 2d 263, 267 (E.D.N.Y. 2005).

While the burden on the Plaintiff at the conditional certification stage is modest, "it is not non-existent", and "the factual showing, even if modest, must still be based on some substance." Jenkins v. TJX Companies, Inc., 853 F. Supp. 2d 317 (E.D.N.Y. 2012), quoting Khan v. Airport Mgmt. Servs., LLC, No. 10-CV-7753, 2011 WL 5597371, at *5 (S.D.N.Y. Nov. 16, 2011), and Guillen v. Marshalls of M.A., Inc., 750 F. Supp. 2d 469, 480 (S.D.N.Y. 2010). There must be a modest factual showing that the potential collective class was subjected to either a common policy or practice that was either facially illegal, or legal facially but de facto illegal in its implementation. Jenkins v. TJX Companies, Inc., 853 F. Supp. 2d 317, 322 (E.D.N.Y. 2012). The Second Circuit has made clear that the requisite modest factual showing "cannot be satisfied simply by unsupported assertions." Myers v. Hertz Corp., 624 F. 3d 537, 555 (2d Cir. 2010).

Crucial to the analysis is the principle that it is not a common policy, plan or practice alone that meets the requisite showing; Plaintiff must demonstrate the existence of a common policy, plan or practice ***that violates the law.*** A facially lawful policy cannot form the equivalent of common policy or

plan that violates the law. Ahmed v. T.J. Maxx Corp., 103 F. Supp. 3d 343, 352-353 (E.D.N.Y. 2015).  For example, the FLSA exempts from overtime requirements bona fide executive employees; a policy of paying a salary, without overtime compensation, to employees designated as exempt is a facially lawful policy, and it is not enough to show that the employer designated categories of employees as exempt from overtime compensation. Rather, to show *de facto* violation of the FLSA, by assigning multiple non-exempt duties to employees designated as exempt, requires a more in depth factual inquiry.

Thus, where Plaintiff sought conditional certification of a nationwide class of assistant store manager employees classified by the employer as exempt management employees, "the mere classification of a group of employees- even a large or nationwide group- as exempt under the FLSA is not by itself sufficient to constitute the necessary evidence of a common policy, plan, or practice that renders all putative class members as 'similarly situated' for §216(b) purposes." Jenkins v. TJX Companies, Inc., 853 F. Supp. 2d 317, 323 (E.D.N.Y. 2012) (citing cases).

If a uniform job description alone was sufficient to warrant conditional certification of a nationwide collective class of employees designated as exempt, "every business in America would be subject to automatic certification of a

21

nationwide collective action on the basis of the personal experiences of a single misclassified employee." Brown v. Barnes and Noble, Inc., ---F. Supp. 3d --- (S.D.N.Y. 2017), 2017 WL 1653576, at * 6. It is for this reason that the common policy or plan complained of must be demonstrated to be one that violates the FLSA- one that is facially invalid under FLSA or de facto invalid as implemented.

Jenkins v. TJX Companies, Inc., 853 F. Supp. 2d 317, 322 (E.D.N.Y. 2012) illustrates the required analysis of the adequacy of Plaintiff's showing that Plaintiff and the putative collective class members are similarly situated, where the alleged FLSA violation is rooted in a facially valid common plan, policy or practice that is alleged to be a de facto violation in its implementation. In denying the motion for conditional certification of a nationwide collective action, the Court distinguished the cases cited by Plaintiff as involving either a common policy that was itself illegal, or a legal common policy with substantial evidence of a de facto illegal policy. See 835 F. Supp. 2d at 323 to 324.

Jenkins involved a putative collective action for recovery of unpaid overtime compensation by a plaintiff employed by Defendants as an Assistant Store Manager (ASM) at store locations in New York. It was undisputed that Defendants did not pay the Plaintiff overtime, because the Defendants

classified all ASMs as exempt from the overtime requirements of the FLSA and NYLL, as persons employed in a bona fide executive capacity. Plaintiff alleged that the Defendants misclassified his position as exempt from overtime provisions, and that all ASMs employed by Defendants were mischaracterized in the same manner.

The Court in Jenkins began the analysis by stating that where Plaintiff proposed a nationwide class, in order to meet the "similarly situated" requirement, the Plaintiff must ultimately demonstrate a nationwide policy pursuant to which ASMs were assigned duties that rendered the employers' exempt classification inappropriate, i.e., a de facto violation of the FLSA.  Notably, the Plaintiff did not allege that the Defendants had an official, formal policy that mandated non-exempt job duties, which would violate the FLSA *in and of itself.* Rather, the Plaintiff alleged that in practice, he primarily performed non-exempt duties.  The sole submission in support of a *de facto* policy requiring ASMs to perform non-exempt tasks was the Plaintiff's deposition testimony which discussed his personal experience as an ASM and the non-exempt tasks he alleged he was required to perform. See 853 F. Supp. 2d at 321.

The Court rejected Plaintiff's argument that additional evidence of a common de facto policy of requiring ASMs to perform non-exempt tasks, beyond his own deposition testimony,

was unnecessary at the conditional certification stage, as well
as the contention that the existence of a common national formal
policy regarding the job responsibilities of ASMs was sufficient
on its own to satisfy the "similarly situated" requirement,
where Plaintiff did not allege that the formal policy was itself
illegal. Moreover, the Court rejected Plaintiff's argument that
because it was undisputed that other ASMs had similar official
job requirements and pay schemes, and were classified as exempt,
any further inquiry into whether the putative class members were
"similarly situated" would be an impermissible ruling on the
merits.  See 835 F. Supp. 2d at 322.

     As the Jenkins Court emphasized, the plaintiff must make a
modest factual showing sufficient to demonstrate that he or she
and the potential plaintiffs together were victims of a common
policy or plan *that violated the law.* Id. (emphasis added).  The
Court was not requiring the Plaintiff to conclusively
demonstrate that every ASM nationwide primarily performed non-
exempt duties, but rather, only the required modest factual
showing that all ASMs nationwide were either subject to a common
facially illegal or de facto illegal policy.  Id.

     Ahmed v. T.J. Maxx Corp., 103 F. Supp. 3d 343 (E.D.N.Y.
2015) similarly involved a claim by a plaintiff employed as an
ASM at a New York store challenging the designation of his job
as exempt, based on the claim that he performed substantial non-

managerial functions, and seeking certification of a nationwide collective action of ASMs employed outside California who were "misclassified" as executives exempt from overtime compensation. In addition to the named Plaintiff, there were nine individuals who had opted in to the proposed collective action; they worked at stores in located in New York, Connecticut, Mississippi, Tennessee, and Alabama.

The Court's opinion addresses Plaintiff's second attempt to conditionally certify a nationwide class.  While the Magistrate Judge granted the first motion to conditionally certify a collective action, the District Judge in 'Ahmed I" granted the Defendants' Motion to set aside the ruling, reasoning that the Court could not presume the existence of a de facto illegal policy common to all ASMs in more than 4000 stores nationwide based only on allegations from three ASMs working in a handful of states in the tri-state area, and in Arkansas.  See 103 F. 3d at 348.

On the renewed motion for conditional certification of a nationwide collective class, where Plaintiff offered additional testimony from nine current and former ASMs who worked in stores located in seven states, the Magistrate Judge denied the renewed motion for conditional certification of a nationwide collective class, and the District Judge denied the Plaintiff's motion to set aside the Magistrate's ruling.  The District Judge noted

that despite an expanded factual record, Plaintiff still failed
to make a modest showing that he and the potential opt-in
plaintiffs "together were victims of a common policy or plan
*that violated the law."* 103 F. Supp. 3d at 352 (emphasis in the
original). The Plaintiff failed to offer any evidence from which
a court could plausibly conclude that the policies *on their face*
violated the FLSA.  Id. (emphasis added).

This case does not involve a facially invalid compensation
plan that violates the FLSA. Piece rate compensation is valid
under 29 USC § 207 (g), which provides in pertinent part:

**(g) Employment at piece rates**

No employer shall be deemed to have violated subsection (a)
by employing any employee for a workweek in excess of the
maximum workweek applicable to such employee under such
subsection if, pursuant to an agreement or understanding
arrived at between the employer and the employee before
performance of the work, the amount paid to the employee
for the number of hours worked by him in such workweek in
excess of the maximum workweek applicable to such employee
under such subsection—

(1)   in the case of an employee employed at piece rates, is
computed at piece rates not less than one and one-half
times the bona fide piece rates applicable to the same
work when performed during nonovertime hours . . . .

Thus, Plaintiff is required to show that the facially valid
piece rate compensation plan was de facto invalid in the manner
in which it was implemented. Plaintiff erroneously contends that

the Defendant did not track or record hours worked by installers[2] (Plaintiff's Memorandum of Law at page 3), and that he was compensated on a piece-rate basis "regardless of the hours I worked." (Thornburn Affidavit, ¶ 13).  Contrary to Plaintiff's unsupported assertions, the testimony of Jason Anderson establishes that the compensation paid to installers was very much tied to the number of hours worked, and that by annotation of the run sheets, the number of hours worked were tracked and recorded.  The compensation paid to installers was tied to the number of hours worked by the per unit compensation plan- every "extra" that required more labor time resulted in an additional "per unit" payment to the installer. Deer Park installers were compensated for travel time by the extra compensation received for travel based on mileage. As Anderson aptly testified to, "the more jobs an installer completes, the more money he earns." The annotation of the run sheets tracked the hours worked by installers, recording their "in" and "out" time for each job, and the amount of travel time required to complete the daily "route."

In addition to Plaintiff's failure to satisfy the required showing of similarly situated by demonstrating the existence of

---

[2] In his Affidavit in support of the Motion, Plaintiff "hedges" on this issue, stating "To the best of my knowledge, Defendant failed to record my work hours." (Thornburn Affidavit, ¶ 3)

a common policy or plan *that violated the law*, Plaintiff cannot establish that Deer Park installers are similarly situated to installers employed at other Deer Park branches, where the Deer Park installers are compensated at a higher per unit rate, and the Deer Park installers are paid extra compensation for travel time based on mileage.

Finally, while Plaintiff seeks conditional certification only for an FLSA case, the fact that NYLL claims are also pled is relevant to the analysis and is an additional factor demonstrating that Plaintiff is not similarly situated to installers employed outside the State of New York.  While the NYLL has a six-year statute of limitations, the state law claims of installers employed in other states may be subject to different limitations periods.  For example, the statute of limitations under the New Jersey Wage and Hour Law is two years. N.J.S.A. 34:11-56a.  Thus, Plaintiff is not similarly situated to installers employed outside New York with regard to the ability to also litigate state law claims.

In sum, whether considered under the more stringent scrutiny analysis of the second stage inquiry, or even the more lenient "modest" showing of a first stage inquiry, Plaintiff utterly fails to show that he and putative class members of installers employed at Door Pro branches other than Deer Park are similarly situated. Accordingly, the Motion for Conditional

Certification as a Nationwide Collective Action should be denied.

**POINT II**

**A THREE YEAR NOTICE PERIOD IS APPROPRIATE WHERE THERE IS NO POSSIBILITY OF CERTICATION OF A RULE 23 CLASS FOR CLAIMS UNDER THE NYLL**

Plaintiff requests a notice period of six years from the date Plaintiff commenced this action. (Plaintiff's Memorandum at page 10). In a footnote, in what can only be charitably described as a gross understatement, Plaintiff "acknowledges that not all potential opt-in plaintiffs are subject to the NYLL six (6) year statute of limitations, however, for purposes of judicial efficiency, it would be logical and efficient to produce the names once, even if a particular state's labor laws do not share a six (6) year statute of limitations." (Plaintiff's Memorandum at page 10, n. 1).

In actuality, there is a very small universe of potential opt-in plaintiffs subject to the NYLL six-year statute of limitations. It is not the case that "not all potential opt-in plaintiffs" are subject to the NYLL six-year statute of limitations; the reality is that the vast majority of opt in plaintiffs are not subject to the NYLL six-year statute of limitations.  At a minimum, it is known

29

that any installers employed in New Jersey are subject to a
two year statute of limitations. Only installers employed
at the Deer Park branch would be eligible to pursue NYLL
claims.  From the testimony of Jason Anderson, it is known
that Deer Park currently employs two installers on a piece
rate basis.  The employee who was the sole manager when
Anderson was hired in 2010 was terminated shortly
thereafter, and his claims under both the FLSA and the NYLL
are time barred. The short term employees who did not last
more than a week were trainees paid a training salary, and
would not be eligible opt ins. That leaves 10 to 12
employees who found they could not do the job and lasted
only three to four months; to the extent their NYLL claims
are not time barred, these short term employees are
unlikely candidates to opt in to the litigation. The
demonstrable reality is that at best, the opt in plaintiffs
who also have NYLL claims will in all probability be a
handful of opt in plaintiffs at best.

    The Courts that do allow a six-year notice period do
so based on the substantial probability that there will
later be a motion to certify a Rule 23 class of employees
who have NYLL claims, and that is where it becomes "logical
and efficient" and promotes judicial economy to provide the
names once.

Here the universe of potential opt-ins who can also assert NYLL claims is so small, there is no possibility rooted in reality that Plaintiff could ever successfully move for Rule 23 certification of a NYLL class; Plaintiff has not even pled class action allegations. With the finite number of potential opt-ins for a NYLL class, Plaintiff could never satisfy the numerosity requirement for Rule 23 class certification.

The FLSA generally provides for a two-year statute of limitations on actions to enforce its provisions, but allows a three-year limitation for a cause of action arising out of a willful violation.  Herman v. RSR Sec. Servs. Ltd., 172 F. 3d 132, 141 (2d Cir. 1999).  When willfulness is disputed as in this case, courts typically apply the three-year limitations period in defining the scope of the collective action. Martin v. Sprint\United Management, 2016 WL 30334 at *16 (S.D.N.Y. 2016) (citing cases).

Unlike the FLSA, the NYLL, does not provide for collective actions. Where both FLSA and NYLL claims are pled, in order to pursue the state law claims on behalf of others similarly situated, the plaintiff must pursue a traditional "opt-out" class action pursuant to FRCP 23 for the state law claims under

the district court's supplemental jurisdiction[3].  <u>Shahriar v. Smith & Wolenksky Restaurant Group,</u> 659 F. 3d 234 (2d Cir. 2011). The Courts are diligent in exercising supplemental jurisdiction pursuant to 29 U.S.C. §1367, to avoid the risk of "allowing a federal tail to wag what is in substance a state dog." <u>De Asencio v. Tyson Foods, Inc.</u> , 342 F. 3d 301, 309 (3d Cir. 2003).  To allow a six-year notice period, for an FLSA class with a three year limitations period at most, based on a very small number of potential opt-ins with NYLL claims that are not time barred, would be the quintessential "allowing a federal tail to wag what is in substance a state dog." <u>De Asencio v. Tyson Foods, Inc.</u> , 342 F. 3d 301, 309 (3d Cir. 2003).

Courts in the Second Circuit and within the Eastern District of New York are split on the appropriateness of adopting the NYLL's six-year statute of limitations for the purpose of sending FLSA notice to a group of potential opt-in plaintiffs. <u>Bhumithanarn v. 22 Noodle Market Corp.,</u> 2015 WL 4240985, at*5 (S.D.N.Y. 2015); <u>Lujan v. Cabana Mgmt., Inc.,</u> 2011 WL 317984, at *9 (E.D.N.Y 2011. Some courts have permitted notice of the longer period on the rationale that even the opt-ins with untimely FLSA claims may shed light on the appropriateness of certifying a class action under the NYLL.

_____

[3]Plaintiff in this case has not pled class action claims for the alleged NYLL violations.

Id. Other Courts have approved only a three-year timeline,
reasoning that authorizing notice to be sent to employees whose
FLSA claims are time barred would amount to sending those
employees a notice informing them that: 1) there is a pending
opt-in litigation; 2) they may not opt-in to the pending
litigation; and 3) they may later receive another notice should
their status change due to class certification, thereby
promoting confusion.  Id.; Lujan v. Cabana Mgmt., Inc., 2011 WL
317984, at *9 (E.D.N.Y 2011) (authorizing notice to only for
three-year statute of limitations under FLSA).

As reasoned by the Court in Bhumithanarn v. 22 Noodle
Market Corp., although the Plaintiff's proposed second amended
Complaint alleged violations of both the FLSA and the NYLL,
Plaintiff sought certification only under federal law, and
referred to the putative collective class as "the FLSA Class"
and the claims collectively as the "FLSA Collective Action
Claims."  Along with the motion for conditional certification as
a collective action, the Plaintiff in Bhumithanarn v. 22 Noodle
Market Corp., sought leave to amend the complaint solely to
assert claims on behalf of similarly situated individuals under
FRCP 23.  Where counsel merely amended the Complaint, and had
not asserted that it would later seek certification of a NYLL
class, much less prevail on a Rule 23 Motion for Class
Certification, the Court found it appropriate to adopt the

33

three-year timeline approach. Id. at *6. Since the purpose of the FLSA notice is to inform potential opt-in plaintiffs of their right to bring FLSA claims, and "not [to] advance counsel's tangential interest in certifying a class of NYLL plaintiffs", the Court authorized notice only for the three-year statute of limitations under the FLSA.  Id. at *6.

Where the Plaintiff asserts claims under both the FLSA and the NYLL, the state law claims may not be asserted as part of the section 216 (b) collective action, but rather, under the Court's supplemental jurisdiction, and would be the subject of a contemplated motion to certify a Rule 23 class action. Lujan v. Cabana Mgmt., Inc., 2011 WL 317984, at *9 (E.D.N.Y 2011).  At the stage of the litigation where conditional certification of an FLSA collective action was sought, there was no basis and no need for the Court to order discovery of information, such as the names and addresses of potential Rule 23 class members, that is relevant only to potential plaintiffs ineligible to opt in to the FLSA collective action.  Id.

In this case, where no Rule 23 class certification is contemplated or even possible, the justification to be efficient in allowing a six-year notice period, in contemplation of a future Rule 23 motion does not apply.  Only a three- year notice period is warranted by the facts of this case.

Plaintiff is also mistaken that the notice period should extend back from the date Plaintiff's Complaint was filed. Because the three-year statute of limitations period for (alleged) willful violations of the FLSA runs for each individual plaintiff until that individual opts into the action, notice is generally directed to those employed within three years of the date of the mailing of the notice.  Ferrara Bakery & Café Inc., 310 F.R.D. 106, 116 (S.D.N.Y. 2015).  Thus the notice in this case should encompass installers employed at the Deer Park branch three years prior to the date of the mailing of the notice.

Finally, Plaintiff requests that Defendant provide names, addresses and telephone numbers for current and former employees. There is no objection to producing names and addresses for installers employed at Deer Park three years prior to the date of the mailing of the notice. Defendant however does not maintain records of phone numbers for employees, and cannot produce that information. (Dum Decl., ¶ 13).

Plaintiff has not submitted a proposed Notice or proposed Consent to Sue.  Defendant therefore reserves the right to make objections to Plaintiff's proposed Notice and proposed Consent to Sue when provided by Plaintiff's counsel.

35

Date: August 16, 2017                    Respectfully submitted,

                                         s/Michael K. Chong

                                         Michael K. Chong